**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SAM J. ALBERTS, Trustee for<br>The DCHC Liquidating Trust,<br><br>Appellant,<br><br>v.<br><br>HCA, INC., GALEN HOSPITAL<br>ILLINOIS, INC., and WESTERN PLAINS<br>CAPITAL, INC., formerly known as<br>C/HCA CAPITAL, LP,<br><br>Appellees. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil No. 12-564 (RCL) |

## <u>MEMORANDUM OPINION</u>

This case is before this Court on appeal from the United States Bankruptcy Court for the District of Columbia. Appellant Sam J. Alberts, the trustee for the Doctors Community Hospital Corporation Liquidating Trust, appeals from the final judgment of U.S. Bankruptcy Judge S. Martin Teel. In bankruptcy court, Alberts had initiated an adversary proceeding against, *inter alia*, appellees Hospital Corporation of America, Inc., and its wholly-owned subsidiaries Galen Hospital Illinois, Inc. and Western Plains Capital, Inc. In 1998, DCHC (through its wholly-owned subsidiary Reese Corporation) bought Michael Reese Hospital from HCA for approximately $66–68 million.[1] In bankruptcy court, Alberts claimed that the sale of Reese Hospital was a "fraudulent transfer" because Reese Corp. did not receive reasonably equivalent value for the price it paid. Alberts sought to avoid and recover as a fraudulent transfer the allegedly excess purchase price.

---

[1] *See infra* note 3 and accompanying text.

After a series of dispositive motions and a five week bench trial, Judge Teel issued a 192-page statement of the bankruptcy court's findings of law and conclusions of fact.  Judge Teel calculated the fair market value of Reese Hospital as $68.6 million, concluded that Reese Corp. received reasonably equivalent value, and entered judgment for the appellees.  Alberts presents two questions on appeal (as thus characterized by Alberts)[2]:

> (1) Did the bankruptcy court err when, in the course of conducting a discounted cash flow analysis, the court treated the Hospital's working capital as a surplus asset and then calculated the Hospital's going concern value by adding the value of the working capital to the value of the income that the Hospital was projected to generate from its operations, assuming its operations were "fully capitalized"?
>
> (2) Did the bankruptcy court err when, in the course of concluding that the Hospital's net working capital could be treated as a surplus asset and added to the Hospital's projected income from operations, the court employed an asset valuation method that was not supported by or consistent with any party's expert or any learned treatise and was not subject to evaluation under the Federal Rules of Evidence?

After reviewing the record on appeal, the underlying decisions of the bankruptcy court, and the parties' briefs, the court finds that Judge Teel correctly ascertained the controlling law and did not commit clear error in his factual findings.  Furthermore, to the extent Judge Teel committed any reversible error regarding his treatment of the net working capital, such error is harmless.  Therefore, this Court will affirm the judgment of the bankruptcy court.

## I.    BACKGROUND

### A.    Factual History

This case concerns the 1998 sale of Chicago-based Columbia Michael Reese Hospital and Medical Center ("the Hospital" or "Reese Hospital").  Hospital Corporation of America ("HCA") is among the world's largest private healthcare providers.  In 1997, HCA began a

---

[2] These are the questions as presented by appellant.  *See* Appellant's Opening Brief 4–5, June 4, 2012, ECF No. 9. In determining the scope of review, the Court considers the questions posed and issues raised by the appellant. However, this Court does not have to take Alberts's questions as given, to the extent appellant may mischaracterize what the bankruptcy court did below.

divestiture program to reduce the number of hospitals it owned.  As part of this program, HCA put Reese Hospital up for sale.  In late 1997 and early 1998, HCA received multiple offers for Reese Hospital.  Doctors Community Hospital Corporation ("DCHC") was interested in purchasing the Hospital.  As the bankruptcy court stated, "DCHC executives were sophisticated and experienced professionals in the healthcare industry…[who] had successfully turned around distressed hospitals and were confident they could do the same with Reese Hospital."  Am. Mem. Dec. Constituting the Ct.'s Findings of Fact & Conclusions of L. 187–88 ("Am. Mem. Dec."), ADV 04-10366, May 19, 2008, ECF No. 596.

On February 18, 1998, DCHC entered into a letter of intent with HCA, indicating that DCHC would purchase Reese Hospital.  DCHC subsequently conducted due diligence before completing its purchase of the Hospital.  On July 8, 1998, Reese Corporation, a wholly-owned and specially-created subsidiary of DCHC, entered into an asset purchase agreement with Galen Hospital Illinois ("GHI"), a wholly-owned subsidiary of HCA, for the purchase of Reese Hospital.  The transaction closed on November 12, 1998 (the "transfer date").  The bankruptcy court concluded as a factual matter that Reese Corp. paid $66,048,640 as consideration for Reese Hospital.  *See* Am. Mem. Dec. 16.[3]

DCHC and Reese Corp. were heavily reliant on financing from National Century Financial Enterprises, Inc. for satisfy ongoing expenses.  In November 2002, National Century filed for bankruptcy, causing accounts from which DCHC and Reese Corp. drew operational funds to be frozen.  Three days after National Century's bankruptcy filing—and a little over four

---

[3] Reese Corp. had transferred a total of $68,048,640.00 to GHI.  The bankruptcy court found as a factual matter that $2 million of that amount "was transferred in exchange for Reese Corp.'s delay in closing on the purchase of Reese Hospital."  Am. Mem. Decision 16.  Therefore, Reese Corp. had only exchanged approximately $66 million as consideration for Reese Hospital.  *Id.*  The Court defers to this factual finding of the bankruptcy court; and to the extent that Reese Corp. actually transferred $68 million as consideration, this difference is immaterial since the Court affirms the holding of the bankruptcy court calculating the fair market value of Reese Hospital on the transfer date as $68,635,940.24.  *See* Am. Mem. Decision 180; *infra* Part III.

years after completing the purchase of Reese Hospital—DCHC filed for Chapter 11 bankruptcy relief.  *See*, *e.g.*, Appellant's Brief 8, Civil No. 12-564, June 4, 2012, ECF No. 9; Trial Tr. 447:5–448:11, Jan. 23, 2007, Ex. 691 to Record on Appeal (testimony of M. Redman) (Ex. I to Appellant's Brief); Trial Tr. 129:21–130:2, Jan. 19, 2007, Ex. 689 to Record on Appeal (testimony of P. Tuft) (Ex. K to Appellant's Brief).

### B.    Procedural History

#### 1.    *Proceedings Prior to Bankruptcy Bench Trial*

DCHC's initial bankruptcy proceedings were protracted, lasting almost 18 months.  On April 5, 2004, the debtors achieved confirmation of their second amended plan of reorganization. Section 6.6 of this reorganization plan created the DCHC Liquidating Trust ("Trust") to liquidate certain assets of the debtors and distribute those funds to certain classes of creditors.  Among the assets conveyed to the Trust were fraudulent conveyance and other actions authorized under Chapter 5 of the Bankruptcy Code.  Sam J. Alberts was appointed trustee of the DCHC Trust. *See* Am. Mem. Dec. 4.

On November 18, 2004, in his capacity as trustee, Alberts instituted an adversary proceeding against HCA (and its affiliated companies and subsidiaries) in the U.S. Bankruptcy Court for the District of Columbia.  This adversary proceeding is the subject of the instant appeal.  Alberts instituted this action to recover, as a fraudulent conveyance under the Illinois Uniform Fraudulent Conveyance Act, the allegedly-excess purchase price Reese Corp. paid for Reese Hospital.  Under the Illinois Act, a bankruptcy trustee can unwind a past transaction if the trustee proves: (1) the debtor transferred goods and received less than reasonably equivalent value in exchange for the transfer; and (2) the debtor was insolvent as of the date of the transaction.  740 Ill. Comp. Stat. § 160/5(a).

This adversary proceeding was also protracted.  Over the course of several memorandum decisions, Judge Teel pared down the issues.  *See Alberts v. HCA Inc.* (*In re Greater Se. Cmty. Hosp. Corp. I*), 365 B.R. 293 (Bankr. D.D.C. 2006) ("*HCA I*"); *Alberts v. HCA Inc.* (*In re Greater Se. Cmty. Hosp. Corp. I*), ADV 04-10366, 2007 WL 80812 (Bankr. D.D.C. Jan. 3, 2007) ("*HCA II*"); *Alberts v. HCA Inc.* (*In re Greater Se. Cmty. Hosp. Corp. I*), ADV 04-10366 (Bankr. D.D.C. Jan. 3, 2007) ("*HCA III*"); *Alberts v. HCA Inc.* (*In re Greater Se. Cmty. Hosp. Corp. I*), 365 B.R. 322 (Bankr. D.D.C. 2007) ("*HCA IV*").

### 2.   *Bankruptcy Bench Trial and Ensuing Opinion of Judge Teel*

On January 19, 2007, Judge Teel commenced a five week[4] bench trial to determine whether the sale of Reese Hospital was a fraudulent conveyance.  During this trial, according to appellees, Judge Teel heard testimony from 23 witnesses and received 772 exhibits into evidence.  *See* Appellees' Brief 2, Civil No. 12-564, July 23, 2012, ECF No. 11.  The primary purpose of this trial was to introduce evidence and advance legal arguments regarding the fair market value of the Reese Hospital, whether DCHC and Reese Corp. received "reasonably equivalent value" for its purchase price, and whether DCHC and Reese Corp. were insolvent at the time of the transfer.  *See* Am. Mem. Dec 3–8.

Judge Teel afterwards issued a 192-page decision outlining the bankruptcy court's findings of fact and conclusions of law.  In order to determine whether DCHC and Reese Corp. received "reasonably equivalent value," Judge Teel needed to determine the fair market value of what Reese Corp. received (the Hospital), and compare it to what Reese Corp. transferred to HCA (the $66 million).  *See Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 378 (7th Cir. 1997).  Judge Teel dedicated the bulk of his opinion to this exercise.  *See* Am. Mem. Dec. 23–180.  At

---

[4] The appellees stated that the trial lasted seven weeks.  *See* Appellees' Brief 8,  Civil No. 12-564, July 23, 2012, ECF No. 11.  Judge Teel stated that the trial lasted five weeks.  *See* Am. Mem. Decision 2.  This discrepancy is immaterial.

the outset, Judge Teel noted that there was no dispute that the sale of the Hospital was the result of arm's-length negotiations between the parties. *Id*. at 22. There are three primary methods for determining "fair market value": (1) the "market" approach; (2) the "net asset" or "cost" approach; and (3) the "income" approach. JAY E. FISHMAN, ET AL., PPC'S GUIDE TO BUSINESS VALUATIONS ¶ 203.2 (15th ed. 2005); SHANNON P. PRATT, ET AL., VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 45 (4th ed. 2000).

The bankruptcy court first found that "there are no truly comparable transactions or public companies from which the court can derive an accurate and reliable fair market value for Reese Hospital using the market approach." Am. Mem. Dec. 25. Alberts does not challenge this determination. Judge Teel then calculated the Hospital's value using the cost approach, which values a business based on the net aggregate value of its underlying assets, focusing on the underlying value of the company's assets in a hypothetical sale rather than on a company's earnings potential. *Id*. at 32. After making a series of factual findings, the bankruptcy court calculated the value of Reese Hospital under the cost approach as $57,985,984.00. *Id*. at 80.

Judge Teel then endeavored to determine the value of Reese Hospital under the income approach. "Under the income approach, the [valuation consultant] estimates the future ownership benefits and discounts those benefits to present value using a rate suitable for the risks associated with realizing those benefits." FISHMAN, PCC'S GUIDE ¶ 203.3. Judge Teel used the "discounted cash flow" method for making such an estimate. Am. Mem. Dec. 81. "Many authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow method." *Lippe v. Bairnco Corp*., 288 B.R. 678, 689 (S.D.N.Y. 2003).

In order to derive a value for Reese Hospital under the income approach, the bankruptcy court took several steps to determine the value of the business enterprise under the discounted

cash flow analysis.  First, the bankruptcy court determined the projected earnings—projecting the earnings before interest and taxes ("EBIT") of the business in question.  Am. Mem. Dec. 83–142.  In making this assessment, Judge Teel reviewed five sets of projections as to the reasonably projected earnings of Reese Corp.  *See id*. at 81–82.  After reviewing these projections, the bankruptcy court concluded "as a factual matter that none of these projections offer a totally realistic picture of the reasonable anticipated future earnings of Reese Corp."  *Id*. at 83.

Judge Teel felt this situation left him with two options.  First, he could have concluded that there were "no credible projections from which [he] could derive a business enterprise value, and that the court's conclusion with respect to the fair market value of Reese Hospital on November 12, 1998, under the income approach should be that no such value can be ascertained."  *Id*. at 134.  The second, "more arduous choice would be to credit" one set of projections "in part then modify the projections consistent with the evidence presented at trial—to attempt, as best the court can, to correct the Reese Management Team's mistakes."  *Id*. at 134.

Judge Teel chose the second option, and made a number of modifications to the Reese Management Team Strategic Assumptions in order to correct deficiencies and errors in the Reese Management Projections and align them with the court's factual findings.  *Id*. at 135–39.  Based on these modified projections, the court made factual findings as to the projected revenue, expenses, and EBIT for the Hospital from the transfer date through 2002.  *Id*. at 139–42.

Second, the bankruptcy court ascertained the net cash flow of Reese Hospital for each of the years in which the projections were made.  *Id*. at 142.  To arrive at this figure, the "factfinder must add projected depreciation and amortization to and subtract projected income taxes, net working capital expenditures, and capital expenditures from the projected EBIT."  *Id*. at 142 (*citing* FISHMAN, PCC'S GUIDE ¶¶ 505.25, 505.39–505.43).  In this section, Judge Teel did not

factor the $20,678,221.00 capital transfer into the net working capital projections, and calculated these amounts assuming that the $20.6 million was not transferred.  *See id.* at 175 & n.110. After making specific factual findings as to these inputs, Judge Teel made final net cash flow projections—ranging from a negative cash flow of $17,762,247.53 in 1999 to a positive cash flow of $14,979,180.61 in 2001.  *Id*. at 149–50.

Third, the bankruptcy court determined the weighted average cost of capital ("WACC")—i.e., "the appropriate discount rate to apply to the projected net cash flow set forth [earlier]."  *Id*. at 150.  After considering evidence and expert testimony about the risk-free rate of return, the equity risk premium, the industry-specific risk premium, the risk premium for the size of the business, the specific company risk premium, the after-tax cost of debt, and the appropriate debt-to-equity ratio, the court made a final factual determination as to the weighted average cost of capital.  *Id*. at 151–64.  The court applied a 19.36% WACC to the projected net cash flows from November 13, 1998, through the end of 2001, and applied a 18.14% WACC to the projected cash flows for 2002.  *Id*. at 164.

Fourth, the bankruptcy court determined the terminal value of Reese Hospital—i.e., the "value of the company as of 'the first full year after the company reaches a stabilized level of growth and sustainable profit margins.'"  *Id*. at 165 (*quoting* FISHMAN, PCC'S GUIDE ¶ 505.45). The court determined as a factual matter that the "Gordon Model," was the proper method to determine the Hospital's terminal value.  *Id*. at 167–68.  The "Gordon Model derives the terminal value of a company by dividing the terminal net cash flow (the first net cash flow resulting from a stabilized level of growth) by the discount rate less long-term growth."  *Id*. at 165.  The court found as a matter of fact that the terminal value of the Hospital was $100,390,116.02.  *Id*. at 169.

Fifth, the bankruptcy court, in the penultimate step to determining value under the income approach, determined the present value of the projected net cash flows and projected terminal value of the business. "The present value is determined by dividing the full value (i.e., the discounted projected net cash flows and capitalized terminal value) by 100% of that net cash flow or terminal value plus the applicable discount or capitalization rate raised to a pre-determined discount period exponentially." *Id*. at 169 (*citing* FISHMAN, PCC'S GUIDE ¶ 505.51). The court then determined, as a factual matter, the appropriate discount rates to apply to determine the present value of the projected net cash flow and terminal value. *Id* at 171–72.

Sixth, the bankruptcy court, in the final step of determining a business enterprise value under the income approach, added the non-operating and excess assets purchased by Reese Corp. as a part of the transaction. *Id*. at 172. The court determined that the Hospital's excess real estate had no asset value, as it would require an expensive and uncertain re-zoning process to make the land valuable to an outside buyer. *Id*. at 173–74. However, the bankruptcy court determined that the expert witnesses erred when they incorporated the $20,678,221 in net working capital acquired by Reese Corp. into their net cash flow calculations. *Id*. at 174. Finding that the record did not permit including the $20.6 million into the income stream for the projections used by the court, the court instead calculated projected net working capital without factoring in the $20.6 million, and then considered the $20.6 million as an non-operating asset. *Id*. at 174–75 & n.110. As a result, the court added $20,678.221 in non-operating and excess assets to the $51,507,704.65 Value As If Normally Capitalized (derived from steps one through five, detailed *supra*) to arrive at a final total business enterprise value of $72,185,925.65. *Id*. at 175–76. This $72 million figure represents the total value of Reese Hospital as determined by the income approach.

Finally, the bankruptcy court reconciled the findings of the court that Reese Hospital was worth $58 million under the cost approach and $72 million under the income approach. *Id*. at 178–80. Based on the testimony of expert witness Kevin Moss and the treatise guidelines for reconciliations, the bankruptcy court found "as a factual matter that it is appropriate to explicitly weigh its determinations of value for Reese Hospital heavily in favor of the income approach." *Id*. at 180. Thus, the court weighed the value under the cost approach at 25%, and the value under the income approach at 75%, deriving a final fair market value for Reese Hospital of $68,635,940.24. *Id*.

The bankruptcy court then determined that the transaction was the result of arm's-length negotiations, and the parties acted in good faith. *Id*. at 180–91. Finally, since "the court's findings of fact with respect to the fair market value of Reese Hospital as of the Transfer Date suggest that Reese Corp. received <u>more</u> than reasonably equivalent value from the Reese Transfers [the $66–68 million], not less," *id*. at 191 (emphasis in original), the court concluded as a matter of law that "Alberts has not demonstrated by a preponderance of the evidence that Reese Corp. did not receive reasonably equivalent value," *id*. at 192. Therefore, the bankruptcy court awarded final judgment and costs in favor of the appellees. *Id*.

### 3. *Post-Trial Briefings and Appeal*

After the bankruptcy court issued its Amended Memorandum Decision, the appellant moved for reconsideration. This motion challenged the court's findings as to reasonably equivalent value and fair market value, and includes many of the arguments appellant raises in his instant appeal. On February 21, 2012, Judge Teel issued a Memorandum Decision denying appellant's motion for reconsideration. Mem. Dec. re: Mot. of Pl. for Reconsideration & Am. of Am. Mem. Dec. ("Recons. Mem. Dec."), ADV 04-10366, February 21, 2012, ECF No. 621.

Thereafter, appellant filed an appeal in United States District Court on April 11, 2012.  *See* Notice of Appeal from Bankruptcy Court, Civil No. 12-564, ECF No. 1.  With the filing of Appellant's Opening Brief, Civil No. 12-564, June 4, 2012, ECF No. 9, the Appellees' Brief, Civil No. 12-564, July 23, 2012, ECF No. 11, and the Appellant's Reply Brief, Civil No. 12-564, Aug. 23, 2012, ECF No. 13, this matter is ripe for consideration.  Upon consideration of the parties' briefs, the record, and the applicable law, this Court will affirm the final judgment of the bankruptcy court for the reasons stated below.

## II.    STANDARD OF REVIEW

United States District Courts have jurisdiction over appeals of bankruptcy court decisions.  28 U.S.C. § 158(a).  On appeal, the district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree, or remand with instructions for further proceedings."  FED. R. BANKR. P. 8013; *see also Advantage Healthplan, Inc. v. Potter*, 391 B.R. 521, 537 (D.D.C. 2008).  The district court reviews conclusions of law de novo and findings of fact for clear error.  *See*, *e.g.*, *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990); *McGuirl v. White*, 86 F.3d 1232, 1234 (D.C. Cir. 1996); *Duvall v. Bumbray*, 423 B.R. 383, 388 (D.D.C. 2010).  "The burden of proof is on the party that seeks to reverse the [b]ankruptcy [c]ourt's holding.  That party must show that the court's holding was clearly erroneous as to the assessment of the facts or erroneous in its interpretation of the law and not simply that another conclusion could have been reached."  *In re Johnson*, 236 B.R. 510, 518 (D.D.C. 1999) (*citing Anderson v. City of Bessmer*, *N.C.*, 470 U.S. 564, 573–74 (1985)).

"Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."  FED. R. BANKR. P. 8013.  "'A finding is clearly

erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *In re Johnson*, 236 B.R. at 518 (*quoting United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).   A reviewing court applying the "clearly erroneous" standard may not "reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.   The reviewing court oversteps the bounds of its duty…if it undertakes to duplicate the role of the lower court." *Anderson*, 470 U.S. at 573.

## III.   DISCUSSION

The Court reviews the legal conclusions of Judge Teel de novo, and does not in any way "defer" to his conclusions of law.   On appeal, the reviewing court should determine the applicable law on its own and then determine whether the lower court applied the correct legal standard.   The Court will defer to the factual findings made by Judge Teel, unless those factual conclusions manifest clear error.   While there is no direct correlation between the length of an opinion and its soundness, *see Dred Scott v. Sandford*, 60 U.S. 393, 399–454 (1856) (majority opinion of Taney, C.J., over 25,000 words long), and this Court must review Judge Teel's legal conclusions de novo, this Court will note that Judge Teel oversaw a five week bench trial and wrote 192 pages explaining his legal and factual conclusions.   *See* Am. Mem. Dec..   After Alberts requested reconsideration of a narrower set of issues, Judge Teel wrote a 55-page opinion explaining his earlier decision.   *See In re Greater Se. Cmty. Hosp. Corp.,* ADV 04-10366, 2012 WL 589269 (Bankr. D.D.C. Feb. 22, 2012).

This Court has closely examined the record, applicable law, and parties' briefs.   This Court concludes that Judge Teel correctly determined the law for ascertaining value under the income approach, did not make any clear errors in his factual conclusions, and properly applied

the law to the facts.  Even if Judge Teel committed the errors alleged by Alberts, such errors would be harmless and not change the outcome of the case below.

A.     **Appellant's First Issue on Appeal: Did the Bankruptcy Court Err in Treating a $20.6 Million Capital Transfer as Surplus, Non-Operating Capital?**

1.     *Appellant's Argument*

In his appeal, Alberts essentially restates a "double counting" argument the bankruptcy court rejected on reconsideration.  As Alberts states in his Opening Brief:

> [T]he bankruptcy court committed reversible error (under any standard of review) by concluding that $20,678,221.00 in net working capital available to the Hospital could be treated as surplus cash for the purpose of valuing the Hospital as a going concern.  Having assumed that the Hospital was "fully capitalized" for the purpose of estimating the Hospital's projected income, the bankruptcy court's decision to then add the Hospital's net working capital to the present value of the Hospital's projected income was inconsistent with the generally recognized business valuation rules that the court purported to apply.  If the bankruptcy court properly had treated the Hospital's net working capital as one of many parts of a complex business enterprise that were necessary for the Hospital to generate income – as both the plaintiff and defense valuation experts did (in accordance with standard business valuation procedures) – then, even accepting all of the bankruptcy court's findings and conclusions as correct, the result would have been precisely the opposite of the result reached.  Instead of concluding that Reese Corporation received reasonably equivalent value when it paid more than $68 million for the Hospital, the bankruptcy court should have entered a judgment in the Trustee's favor because Reese Corporation overpaid by at least $15,508,665.75, or approximately 22 percent of the purchase price.

Appellant's Brief 4.

Alberts argues that the bankruptcy court, when it "itself found that working capital needed to fund operations would have to be derived from future income that the operations were expected to produce," it acted contrary to both sides' experts who "treated the available working capital as a necessary asset for the Hospital's operations."  *Id*. at 6.  Alberts elaborates:

> The bankruptcy court's error with respect to working capital was not an instance of finding one witness more credible than another, or the court's accepting one version of events over another.  When the court calculated the Hospital's going concern value as it did, it acted capriciously and contrary to both sides' experts'

opinions, basic business valuation theory, and the undisputed facts.   Under standard business valuation principles, when a company's value as a going concern is calculated, necessary working capital may not be added to the value of the company's projected future income; the value of a capital asset may be added to the value of the company's projected future income *only* when the asset is not needed to fund operations and can be deemed surplus.  In this case, nothing in the record below supports the notion that the Hospital had surplus capital. …[W]hile the court asserted that both sides' experts were wrong in certain of their calculations, the court itself employed a valuation method that has no support anywhere – let alone in the treatise on which the court purported to rely.

*Id*.

### 2.        *Standard of Review*

First, the Court must determine which standard of review to apply to the bankruptcy court's treatment of the $20.6 million capital transfer.  While the D.C. Circuit has not spoken to this precise issue, other circuits have held that "[a] bankruptcy court's finding of reasonably equivalent value is a factual determination subject to a 'clearly erroneous' standard of review." *In re TransTexas Gas Corp.*, 597 F.3d 298, 305 (5th Cir. 2010).  *See also In re Fruehauf Trailer Corp.*, 444 F.3d 203, 212 (3d Cir. 2006) (reviewing reasonably equivalent value determination for clear error).   In support of his argument that this Court should consider Judge Teel's conclusions de novo, Alberts cites a single truncated sentence from one bankruptcy court decision:   "The bankruptcy court's selection and application of valuation methodology is primarily a legal matter."  *Nat'l Rural Utils. Co-op Fin. Corp. v. Wabash*, 111 B.R. 752, 767 (Bankr. S.D. Ind. 1990) (*cited at* Appellant's Brief 2).  As appellees point out, the omitted portion of that sentence states: "whereas the findings made under the selected valuation standard are factual."  *Id*. (*cited at* Appellees' Brief 14).

Appellees then cite a number of cases showing that the *Wabash* opinion is an outlier on this point, and that other circuits state that even a bankruptcy court's selection of a valuation methodology could be subject to clearly erroneous review.  Appellees' Brief 14 (*citing Gross v.*

*Comm'r*, 272 F.3d 333, 343 (6th Cir. 2001) ("The choice of the appropriate valuation methodology for a particular stock is, in itself, a question of fact.") (citations omitted); *Estate of Godley v. Comm'r*, 286 F.3d 210, 212 (4th Cir. 2002) (valuation methodology is "part of the larger factual question of valuation" and this reviewed for clear error); *Sammons v. Comm'r*, 838 F.2d 330, 334 (9th Cir. 1998) (whether Tax Court appropriately selected cost method of valuing art collection is question of fact reviewed for clear error)).   In his Reply, Alberts did not address appellees' arguments as to the proper standard of review.  He does not cite any additional cases in support of his view, nor does he attempt to distinguish the cases cited in the Appellees' Brief.

Alberts states, in his Opening Brief, that "Defendants doubtless will characterize the bankruptcy court's finding as a factual one that is entitled to deference.  They will point out that the bankruptcy court reviewed many documents, heard testimony from many witnesses, and explained its findings in lengthy and detailed opinions,  But those arguments cannot carry the day when the finder of facts makes an error in business valuation as egregious as the one here." Appellant's Brief 39.  This Court certainly agrees that "[a]ccounting errors are not immune from challenge on appeal," *id*., but does not understand how the alleged egregiousness of a lower court's errors affects the standard of review.[5]  The degree to which something is wrong does not determine the standard of review—it determines whether the applicable standard is met. Deferring to a trial court's findings of fact does not make those findings unchallengeable.  A flagrant error of fact is still an error of fact, subject to review under the clearly erroneous standard.  *Cf. Pullman–Standard v. Swint*, 456 U.S. 273, 287 (1982) ("Rule 52(a) broadly

---

[5] The appellant apparently tries to argue that all of the bankruptcy court's challenged findings are legal and subject to de novo review.  In fact, the quoted language comes from a section titled, "The Bankruptcy Court's Rulings Are Not Entitled to Deference and Should Be Reviewed *De Novo*."  Appellant's Brief 38.  Nowhere in Alberts' briefs does he clearly concede that certain findings of the bankruptcy court are actually factual, but do not survive review under the clearly erroneous standard.  At times, Alberts makes sweeping statements that Judge Teel's findings would not survive under "any standard of review," *see id*. at 8, or that certain conclusions fail even the clearly erroneously standard, *id*. at 39.  However, this Court does not take those statements as concessions that this Court should apply the clearly erroneously standard.

requires that findings of fact not be set aside unless clearly erroneous.  It does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a court of appeals to accept a district court's findings unless clearly erroneous.  It does not divide facts into categories[.]").  The threshold question is which questions are of law and which are of fact.  Once the Court determines the appropriate standard, it considers the degree of the error to decide whether the Court can uphold the trial court's finding under the applicable standard.

### 3.  *Review of Bankruptcy Court's Decision*

Appellant's "double counting" argument mischaracterizes what the bankruptcy court did and asks the court to subject factual determinations to de novo review.  Alberts had raised most of this argument before when requesting reconsideration of the bankruptcy court's Amended Memorandum Opinion.  Under any standard of review, this Court agrees with how Judge Teel responded to this "double counting" argument in pages 4–11 of his Memorandum Decision Denying Reconsideration, which states in pertinent part:

> [I]t is useful to summarize how the court treated the $20,678,221 of net working capital.  The court valued assets under an income approach by first valuing the assets as though the $20,678,221 of net working capital *had not been* acquired by Reese Corp. (which would have resulted in a value of $51,507,704.65 under the income approach).   The court then asked what would be added to that $51,507,704.65 value under the income approach if, as occurred, the $20,678,221 of net working capital had *also* been acquired by Reese Corp.  It stood to reason that the value of that $20,678,221 in net working capital ought to be added to the $51,507,704.65 to arrive at a total value of $72,185,925,65 under the income approach.  There was no double counting.
>
> *            *            *
>
> In making his double counting argument, Alberts contends that the $20,678,221 was included in the court's net cash flow calculations utilized to arrive at an initial Value As If Normally Capitalized of $51,507,704.65.  In actuality, the Amended Memorandum Decision made clear that the $20,678,221 was *not* being included in the court's net cash flow requirements….
>
> Instead, in its discounted cash flow model, the court took into account future accounts receivable on an accrual basis in accordance with generally acceptable

accounting procedures that are utilized in performing a valuation based on an income approach. Such future accounts receivable, *not* in existence on the transfer date, were distinct from the $20,678,221 that *was* in existence on the transfer date. …In other words, the court's discounted cash flow model was based on accruals of amounts that would be owed for future patient services and for operating revenue generated by other post-transfer events, and those amounts were unrelated to the $20,678,221 in working capital transferred on the sale date. Alberts's assertion that the court included the net working capital "and related revenue, interest income, and expenses" in its discounted cash flow calculation (Pl. Mot. Recons. at 12 n.8) is simply wrong.

…[T]he record lacked sufficient information to permit the court, in making projections of net cash flow, to include the $20,678,221 in those projections as net working capital on hand to utilize in operations[.] …Accordingly, instead of including the $20,678,221 in the court's calculation of the initial "Value As If Normally Capitalized" of $51,507,704.65 under the income approach, the $20,678,221 was added to that value as a stand-aside asset, as though it were a non-operating asset, to arrive at the "Total Business Enterprise Value" of $72,185,925.65 under the income approach (Amended Mem. Dec. at 174–76).

Recons. Mem. Dec. 6–9 (emphasis in original). No matter how many times Alberts makes the argument, or how strenuously he presents it, there was simply no double counting.

On appeal, Alberts raises some additional issues. He focuses a great deal on how Judge Teel "deviated" from the experts at trial. He argues that, "[t]o the extent that the bankruptcy court believed that adding a non-surplus asset to the value of the Hospital's future income was appropriate, that belief was inconsistent with the views of the business valuation experts for both sides." Appellant's Brief 29. The bankruptcy court acknowledges that its treatment of the $20.6 million capital transfer differed from how the experts dealt with it:

But if [expert witnesses] Moss and Demchick erroneously swelled the business enterprise value of Reese Hospital by considering the surplus real estate…as an asset to be sold, they committed a far greater error to the detriment of the hospital's value by failing to consider the assets purchased by Reese Corp. in the form of the net working capital sold to Reese Corp. at the time of the hospital's purchase. …These assets must be added to the value of Reese Hospital as if normally capitalized to fully reflect the business enterprise of the hospital.

Am. Mem. Dec. 174–75. Appellant contends that by disagreeing with the experts, Judge Teel did not commit an error of fact, but of law—that Judge Teel got his basic valuation theory

wrong, and thus this Court should afford him no deference.  Bankruptcy judges, acting as fact finders, are free to credit or disregard portions of expert testimony without subjecting those decisions to de novo review.  *See*, *e.g.*, *In re Exide Tech.*, 303 B.R. 48 (Bankr. D. De. 2003) (court rejected both experts' discount rates and applied its own); *infra* Part III.B (rejecting Alberts's *Daubert* argument for overturning the bankruptcy court).

As noted *supra*, Alberts relies on an isolated clause from a single decision for the proposition that this Court should review the *application* of a valuation method de novo.  The cases cited by appellees—stating that a bankruptcy court's valuation determinations are issues of fact—are more persuasive and appear to represent the majority view.  *See supra* Part III.A.2. Under a reasonable reading of the *Wabash* case, 111 B.R. 752, this Court is willing to review the bankruptcy court's basic selection of a valuation method de novo.  Under that standard, this Court easily finds that Judge Teel's selection of a business valuation methodology was in line with settled law and learned treatises.  *See*, *e.g.*, Am. Mem. Dec. 81–82; Fishman, PCC's Guide ¶ 203; *Lippe*, 288 B.R. at 689.  Selection of a business valuation method does not extend, as appellant would have it, to how the bankruptcy court treats certain assets under that method.  In other words, just because the bankruptcy court disagreed with how experts *applied* the methodology to the facts of the case does *not* mean that the bankruptcy court made up its own unorthodox business valuation methodology.  *Cf.* Appellant's Brief 27–31.  The real issue is how Judge Teel, after *selecting* a business valuation methodology, treated the $20.6 million capital transfer under the selected approach.  This issue, which Alberts is eager to make one of valuation methodology (and, thus, law), is really an issue of fact.[6]

---

[6] Or at best, a mixed issue of law and fact, in which factual issues predominate.  In such cases, the reviewing court shall—to the extent possible—distinguish factual predicates from legal principles, and apply the applicable standard to each type of issue.  *See United States v. Drew*, 200 F.3d 871, 880 (D.C. Cir. 2000) ("On a mixed question of law and fact we use a sliding scale depending on the 'mix' of the question.").  *See also United States v. Ahn*, 231 F.3d

Judge Teel treated the $20.6 million capital transfer the way he did because of two key, essentially factual determinations. First, Judge Teel determined that the record lacked sufficient evidence for him to incorporate the capital transfer into the income stream (as urged by Alberts):

> Theoretically, the net working capital purchased by Reese Corp. could be included in the income stream for the projections used by the court to determine the value of Reese Hospital as if it were normally capitalized. After all, a reasonable purchaser would not expect to collect the revenues from its post-transaction operations immediately, but rather would depend on the income stream from the net working capital until post-transaction revenues began to trickle in. Alternatively, it could be argued that the net working capital purchased by Reese Corp. as a non-operating asset as the court has done, but that as a consequence the court should project no revenue whatsoever for Reese Hospital until the hospital began to collect on its accounts receivables.
>
> Ultimatley, neither approach is feasible. There is no information in the record from which the court can ascertain the average delay in the hospital's collection of accounts receivables, and thus no way to incorporate the income stream from the net working capital into the court's projections.

Am. Mem. Dec. 175 n.110. The inferences the fact finder draws from the factual determinations are subject to clearly erroneous review. *See Halverstam v. Welch*, 705 F.3d 472, 486 (D.C. Cir. 1983). And as Judge Teel later explained on reconsideration, even if the record supported including the capital transfer into the income stream, that would not alter the result:

> Even if the court *was* wrong, and the $20,678,221 could reliably be factored into the income stream calculation, Alberts has not provided calculations showing what the value would be if the $20,678,221 in net working capital were factored into the court's income stream calculation. If the $20,678,221 of net working capital were factored into the income stream calculation, the resulting "Value As If Normally Capitalized" of $51,507,704.65 would necessarily increase by $20,678,221, with an adjustment for the time value of money. …[T]he adjustment for the time value of money (to reflect the dates of collection of the accounts receivable and GHI's guarantee included in the $20,678,221, and the dates of payment of accounts payable included in the $20,678,221) would be insufficient to have a meaningful impact on the outcome of this proceeding.

---

26, 38 (D.C. Cir. 2000); *Barbour v. Browner*, 181 F.3d 1342, 1348 (D.C. Cir. 1999). Here, the court can separate the legal question (the selection of a valuation method) from the factual predicates (findings of fact regarding the net capital requirements excluding the $20.6 million dollar transfer, the value of the transfer) and other trial court determinations that warrant deference (the determination that the record was insufficient to permit incorporating the $20.6 million capital transfer directly into the discounted cash flow calculations).

Recons. Mem. Dec. 9–10 (emphasis in original).

Second, since the record lacked sufficient information to allow Judge Teel to incorporate the $20.6 million capital transfer into the discounted cash flow, Judge Teel made a series of factual findings regarding the net working capital requirements *disregarding* the $20.6 million transfer. Judge Teel found "as a factual matter that a hypothetical purchaser would reasonably project net working capital infusions to be the difference between the prior year's net working capital and 10% of the total net revenue for the year in which the projection of net working capital is made." Am. Mem. Dec. 145. Applying this principle to the evidence, Judge Teel projected net working capital requirements from the time of the transfer though 2002. He determined that a reasonable purchaser—disregarding the $20.6 million that cannot reliably be factored in to the cash flow analysis—would expect to make annual net capital contributions of between $1.2 and $2.3 million in order to make the business fully capitalized. Am. Mem. Dec. 149–50. He incorporated these findings in his calculation of the Hospital under the income approach, deriving a Value As If Normally Capitalized of $51,507,704.65. *Id.* at 175–76.

Alberts contends that there was no evidence in the record that would allow Judge Teel to treat the $20.6 million as surplus capital, instead of as capital necessary to fund the ongoing operations of the Hospital. Appellant's Brief 22–24. Alberts claims that "[w]itnesses called to testify by both sides agreed that the Hospital constantly was strapped for cash even with the working capital provided under the asset purchase agreement." *Id.* at 22. However, the testimony cited by the appellant largely concerns *post*-transfer financial struggles. *Id.* at 22–24 ("the shortage of funds *following the sale* was 'just a continual burden for the management people to try to live under'" (emphasis added)); (testimony describing post-sale history of late payments, credit holds, and reliance on high-interest line of credit from NCFE). Whether a

transfer was for reasonably equivalent value "'must be determined as of the date of the transaction.'"   Am. Mem. Dec. 20 (*quoting Daley v. Chang*, 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002)).   This testimony about the post-sale financial struggles of Reese Hospital does not show that the bankruptcy court's treatment of the $20.6 million capital transfer was clearly erroneous or unsupported by the evidence.

Judge Teel's treatment of the $20.6 million capital transfer under the income approach relied heavily on his determinations of the facts and sufficiency of evidence.   Judge Teel did not simply assume, in the face of contrary evidence, that the Hospital was fully capitalized notwithstanding the $20.6 million transfer.   *Cf.* Appellant's Brief 4.   In fact, Judge Teel's projections assume that a reasonable purchaser would predict the need to provide millions in working capital infusions—and these assumptions are built into the bankruptcy court's valuation of Reese Hospital as a going concern.   He found that the record did not provide a reliable way to incorporate the $20.6 million into the cash flow projections.   As Judge Teel comprehensibly shows, he did not "double count" the capital transfer, and including the $20.6 million into the cash flow analysis would have no perceptible effect on the value of Reese Hospital under the income approach.   Therefore, this Court will affirm the bankruptcy court's treatment of the $20.6 million capital transfer.

B.     **Appellant's Second Issue on Appeal:   Did the Bankruptcy Court, in Determining the $20.6 Million Transfer was Surplus Capital, Improperly Deprive the Appellant of the Opportunity to Challenge the Business Valuation Method Used by the Bankruptcy Court or Usurp the Role of an Expert Witness?**

Appellant frequently suggests that, since the bankruptcy court treated the $20.6 million capital transfer differently than both parties' experts, the bankruptcy court must have done something wrong.   In his first grounds for appeal, appellant invoked this "straying from the

experts" trope in an attempt to recast factual questions as legal questions.  In this section, appellant makes the novel claim that the bankruptcy court

> should be reversed because, even if the bankruptcy court's methodology potentially could have merit…, the bankruptcy court deprived the Trustee of important procedural protections when the court substituted its own expert opinion for the opinions of testifying experts.  In proceeding as it did, the bankruptcy court prevented the Trustee from challenging the business valuation methodology that was ultimately used to deny Trustee's claim.

Appellant's Brief 36.  This is Alberts's "*Daubert* and *Kumho*" argument against the judgment of the bankruptcy court.   He argues that Judge Teel essentially acted as an expert witness without first ensuring that his expert testimony was reliable per *Daubert* and *Kumho*.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–99 (1993) (trial court has a "gatekeeping" obligation to ensure scientific testimony is relevant and reliable); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158 (1999) (*Daubert* applies to non-scientific expert testimony).   Alberts also argues that since Judge Teel usurped the role of an expert, he deprived Alberts of "procedural protections" regarding expert witnesses.  Appellant's Brief 36–37.  *See also* FED. R. EVID. 706(b) (expert must advise parties of any findings, may be deposed, may be called to testify, and may be cross-examined); FED. R. CIV. P. 26(a)(2) (disclosure rules for expert witnesses).

This argument is wholly without merit.  First, it relies on a false premise—in disagreeing with both experts on the issue of how to treat the $20.6 million capital transfer, the bankruptcy court did not usurp the role of the expert witness.  It is a fundamental principle that a fact finder is "not compelled wholly to accept or wholly to reject" the testimony of an expert witness, and is "entitled to credit part of [the witness's] testimony and discredit the balance[.]"  *Moore v. Chesapeake & O. Ry. Co.*, 340 U.S. 575, 579 (1951) (Black, J., dissenting).  *See also Moore*, 340 U.S. at 576 ("[I]t is the jury's function to credit or discredit all or part of the testimony.") (Minton, J., majority opinion); *Ortco Contractors, Inc. v. Carpenter*, 332 F.3d 283, 292 (5th Cir.

2003) (fact finder "'is entitled to consider all credibility inferences,'" "'may consider any part of an expert's testimony,'" or "'may reject it completely.'" (*quoting Avondale Shipyards, Inc. v. Kennel*, 914 F.2d 88, 91 (5th Cir. 1990)).

Defending himself from another "you disagreed with both experts" type argument on reconsideration, Judge Teel stated that a trial court may "disregard[] erroneous testimony, regardless of the proponent of that testimony, and decid[e] a case based on the actual state of affairs."  Recons. Mem. Dec. 13.  Judge Teel disregarded expert testimony that he did not find supported by the record.  *See supra* Part III.A.3.  In doing so, he was acting within his role as fact-finder, not usurping the role of expert witness.  *Cf. In re W.R. Grace & Co.*, 475 B.R. 34, 143 (D. Del. 2012) (district court applies clearly erroneous standard to bankruptcy court's decisions whether or not to credit expert testimony).

Alberts argues that if the bankruptcy court disagreed with both experts, it should have appointed another expert, per Federal Rule of Evidence 706.  Appellant's Brief 38.  While Judge Teel may have had that power, he was under no obligation to do so, and his failure to appoint an expert did not violate appellant's procedural rights.  Appellees put it best:

> The trial court's role is to determine if the Trustee had carried his burden of establishing that the Hospital value was not reasonably equivalent to the $66 million purchase price.  …The notion that a trial court must request supplemental reports, additional experts, and further cross-examination where the evidence at trial is lacking fundamentally misunderstands the role the burden of proof plays at trial: those failings are held against the plaintiff, not the court's findings.

Appellees' Brief 30.  Appellant's second grounds for appeal—that the bankruptcy court usurped the role of an expert witness in violation of the procedural safeguards of *Daubert* and *Kumho*— mischaracterizes the actions of Judge Teel and is legally unsound.[7]

---

[7] Additionally, Alberts complains that Judge Teel "improperly calculated the effect of depreciation on the Hospital's income, resulting in the erroneous addition of at least $6,839,904.55 to the court's valuation of the Hospital as a going concern.  Specifically, the bankruptcy court extended depreciation deductions in excess of capital

**C.      Even if the Bankruptcy Court Erred on the Issues Raised by Appellant, Any Such Error Would be Harmless**

The bankruptcy court went to significant lengths to explain why, even if it assumed a number of disputed issues in appellant's favor, appellant would still fail to carry his burden. To this Court, Judge Teel's offer of separate grounds strengthen the result; however, it seems to have provided Alberts additional avenues for attacking the judgment of the bankruptcy court on appeal. Alberts challenges one of several separate, independent grounds the bankruptcy court offered for its decision. Even if Judge Teel committed reversible error when determining the value of Reese Hospital under the income approach, appellant would not be entitled to a reversal as such error would be harmless.

First Judge Teel would have been completely justified in ruling against appellant because Alberts failed to meet his burden of proof for his fraudulent conveyance claim. The sale of Reese Hospital was the result of good faith, arm's-length negotiations. Since the bankruptcy court did not find the income projections submitted by Alberts's experts credible and reliable, appellant failed to provide evidence by which the bankruptcy court could determine the fair market value of Reese Hospital, and in turn appellant failed to prove that appellant did not receive reasonably equivalent value. Furthermore, upon reconsideration, Judge Teel revisited some facts he previously assumed in favor of appellant. In so doing, Judge Teel determined that

---

expenditures into perpetuity, thereby crediting the Hospital with tax savings it would never realize." Appellant's Brief 6. This depreciation issue was not one of the stated grounds for appeal, *see id*. at 1–2, but this Court will address it briefly.

Alberts's raised this depreciation issue for the first time on reconsideration. *See* Recons. Mem. Dec. 40–55. However, how Judge Teel treated depreciation was in line with how Alberts's own expert, Demchick, treated depreciation at trial. *See id*. at 42–43. Ironically, here Alberts argues that Judge Teel committed error when he *didn't* stray from the experts and calculate depreciation in a way no expert did at trial. In its reconsideration opinion, the bankruptcy court properly determined that it was "inappropriate after the trial has concluded for [the Trustee] to inject a new argument into the proceeding." *Id*. at 42. Alberts's supported his new depreciation argument with a post-trial affidavit from Demchick. The bankruptcy court was correct to disregard this post-judgment affidavit in support of Alberts's new argument. *See Russ v. Int'l Paper Co*., 943 F.2d 589, 593 (5th Cir. 1991). Therefore, this Court rejects Alberts's argument that Judge Teel erred in his depreciation calculations.

the value of possibly renegotiating higher HMO reimbursement rates from Humana was over $21 million—an amount that would more than offset any error of the bankruptcy court in its treatment of the $20.6 million capital transfer.  Under these two, separate and independently-sufficient grounds, even if Judge Teel committed the error alleged by the appellant, such error would be harmless and not require a reversal of the bankruptcy court's judgment.

> **1.**    ***The Alternative to Judge Teel's "Idiosyncratic" Valuation Method Would Have Been to Simply Rule Against Alberts Because Alberts Failed to Meet his Burden to Prove that there was a Fraudulent Conveyance***

Alberts's second ground for appeal—his complaint that Judge Teel somehow acted as an expert witness with an idiosyncratic and untested methodology—is self-defeating.  Judge Teel supposedly erred when he, in an attempt to correct the errors endemic in appellant's submitted income projections, allegedly "made up" his own infirm valuation methodology.  Appellant's Brief 26–31.  This argument is unavailing—the role of a bankruptcy court judge is not simply to pick which expert the judge likes most and then credit that expert's testimony fully.  He may decide to credit or discredit, in whole or in part, the testimony of any expert witness, and decide the case on the evidence.  *See supra* Part III.A.3.

But even if Judge Teel erred in his attempt to salvage the Reese Management Team's projections and otherwise derive a usable income valuation, this would not be reversible error.  First, this Court agrees with Judge Teel—under any standard of review—that the all five sets of projections made available to Judge Teel suffered from "one or more serious defects that prevents the court from taking them at face value."  Am. Mem. Dec. 83.  Judge Teel's legal conclusions regarding what makes an earnings projection reliable and reasonable vis-à-vis calculating the value of a business enterprise under a discounted cash flow analysis are affirmed under de novo review.  *See* Am. Mem. Dec. 83–132.  Judge Teel properly determined, as a

factual and legal matter, that none of the earnings projections provided by Alberts were—by themselves—credible and reliable enough to allow the bankruptcy court to derive a business enterprise value for Reese Hospital.

In applying those legal principles to the five projections at issue, Judge Teel had to make judgments as to reliability of the evidence, and the credibility and qualifications of those witnesses explaining the projections. This Court reviews the a lower court's evidentiary rulings for an abuse of discretion. *General Elec. Co. v. Joinder*, 553 U.S. 136, 141 (1997). A reviewing court must apply "an abuse-of-discretion standard when it 'review[s] a trial court's decision to admit or exclude expert testimony.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (*quoting Joinder*, 552 U.S. at 138–39). "That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion." *Kumho*, 526 U.S. at 152. Once a trial judge decides to permit an expert to testify, the fact finder may decide to credit or discredit the testimony of an expert witness, in whole or in part—and courts review these determinations of the trier of fact under the plain error/clearly erroneous standard. *See*, *e.g.*, *MacGuineas v. United States*, 927 F.2d 1258 (D.C. Cir. 1991) (court of appeals reviews for clear error district court's decision, as trier of fact, to credit expert testimony). This Court must only overturn factual findings of the bankruptcy court if those findings are clearly erroneous, and this Court must give "due regard" to "the opportunity of the bankruptcy court to judge the credibility of witnesses." FED. R. BANKR. P. 8013. *See also In re W.R. Grace & Co.*, 475 B.R. at 143.

Judge Teel felt he had two choices when he concluded as a factual matter that he could not fully credit any of the five projections before him. He took the "more arduous choice" of crediting the projections in part consistent with the evidence presented at trial, and trying to correct for the errors to derive a usable income valuation. Am. Mem. Dec. 134–35. This Court

commends Judge Teel for undertaking what had to have been incredibly time-consuming and detail-oriented work.  But Judge Teel would have been equally within his rights to take the first option—finding that, "absent a reliable [discounted cash flow] valuation, Alberts has not proven what a hypothetical purchaser would have paid for Reese Hospital," and then deciding against Alberts because of a critical failure of proof on a dispositive issue for which Alberts had the burden of proof.  *Id*.

Judge Teel endorsed the first option in his reconsideration opinion.  At the outset of this discussion, the bankruptcy court discussed the role of good faith, due diligence, and arm's-length negotiations in greater detail.  Recons. Mem. Dec. 28–37.  While Alberts tries to minimize the importance of these factors,  Appellant's Reply 2–3, Judge Teel is correct to point out that the law of fraudulent conveyance and concept of reasonably equivalent value

> recognizes that the buyer can get a good deal, even a great deal, but not an obscene deal at the expense of the debtor's creditors, that is, when the debtor is insolvent.
>
> The functional approach to reasonably equivalent value recognizes that the purpose of fraudulent transfer law is not to allow the debtor to re-trade a transaction struck in good faith and arrived at by arm's-length negotiations.  Such a transfer should not be a viable target of fraudulent transfer law.

Recons. Mem. Dec. 30 (*quoting* Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, 8 BANKR. DEV. J. 55, 86 (1991)).  Judge Teel had previously determined that the asset purchase agreement outlining the terms of the sale "was the result of arm's length negotiations between the parties," Am. Mem. Dec. 180 (*citing HCA III*, slip op. at 27–28) and after trial he concluded "as a factual matter that the purchase of Reese Hospital was conducted in good faith, and that Alberts failed to offer any evidence of bad faith," *id*. at 180–81.  Alberts does not challenge this finding of good faith on appeal.  Therefore, this Court affirms Judge

Teel's findings that the sale of Reese Hospital was the product of a good faith, arm's-length negotiation between the parties.

These findings of good faith are not dispositive—Alberts may still prevail if there is a significant difference between what Reese Corp. paid and what Reese Hospital was worth.   *See Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir. 1997).[8]   However, these findings are key to Alberts's failure of proof.   Since Alberts cannot, or has not, offered any evidence of actual fraud, he must rely on a significant disparity between the value of the Hospital and its sales price.   Since Alberts has the burden of proof in his fraudulent conveyance claim, he has to introduce reliable evidence proving, by a preponderance of the evidence, that the value of Reese Hospital at the time of the transfer was significantly less than the $66–68 million paid for it. *See*, *e.g.*, *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 546 (1994); *In re Zeigler*, 320 B.R. 362, 374 (Bankr. N.D. Ill. 2005).   It is not up to the bankruptcy court or appellees to show that appellant got a fair bargain; appellant must prove that the deal was so one-sided as to infer fraud. *See*, *e.g.*, *Barber*, 129 F.3d at 387.

In his reconsideration opinion, Judge Teel expands on appellant's failure of proof.   While Judge Teel took the more difficult, perilous option and tried to fix a value to Reese Hospital, he only had to go down that path because of the failure of Alberts to provide reliable, credible projections.   As Judge Teel explained in his reconsideration decision (in a passage this Court affirms and adopts under any standard of review):

> In its original decision, the court rejected the projections of Alberts's expert, Demchick, as not being rooted in any kind of operational reality.   **The court could have ruled that Alberts has not established his case on the basis that,**

---

[8] Since appellant brought an action under the Illinois Uniform Fraudulent Transfer Act, 740 Ill. Comp. Stat. § 160/1, Illinois substantive law applies to the elements of the underlying fraudulent transfer action.  *See HCA III*, slip op. at 7–8. "Federal bankruptcy law and Illinois law on fraudulent transfer are…essentially identical."  *Peterson v. Atradius Trade Credit Ins., Inc.*, 451 B.R. 833, 838 (N.D. Ill. 2001).  *See also Hemls v. Roti*, 271 B.R. 281, 303 (Bankr. N.D. Ill. 2002); *In re Crystal Med. Products, Inc.*, 240 B.R. 290, 300 (Bankr. N.D. Ill. 1990).

**without a reliable discounted cash flow analysis, Alberts had not shown what a hypothetical purchaser would have paid for the assets that Reese Corp. acquired**.

Instead, the court attempted…to show that even if the court embarked on its own discounted cash flow projections after making what the court thought were appropriate adjustments to the Reese Projections, the result was the same:  Alberts had not shown that Reese Corp. paid less than the value of what it received. Specifically, the court credited the Reese Projections in part and modified the projections in part consistent with the evidence presented at trial to attempt to derive an appropriate discounted cash flow analysis.  Even under that approach, the court concluded that Reese Corp. paid less for the assets it acquired than they were worth, **thus further supporting the finding that Alberts did not present sufficient evidence to carry his burden of proving that less was paid for the assets than they were worth**.

As the court recognized, however, that approach was fraught with peril.  **This court's discounted cash flow analysis was an attempt to buttress the conclusion that Alberts had failed to present expert testimony establishing the value of the property**, and was rife with uncertainty as to whether the court's assumptions were correct.  …

As the plaintiff, Alberts suffers the consequences of any resulting doubts as to the reliability of the evidence regarding events and conditions at the time of the transaction in reaching a clear picture of the value of what Reese Corp. received. Alberts bore the burden of proving the fair market value of the property for purposes of ascertaining whether the assets received were reasonably equivalent value, and the fair market value remains in doubt.  I conclude that Reese Corp. received "reasonably equivalent value."  I make this finding taking into account:

- • the arm's length nature of the transaction;

- • the good faith of both parties;

- • the due diligence of Reese Corp. in pursuing the purchase;

- • the large degree of uncertainty regarding what assumptions a hypothetical purchaser would have made in purchasing the property and thus the large degree of uncertainty regarding the true fair market value of what Reese Corp. received in the transaction;

- • the failure of Alberts to offer reliable expert testimony with which to fix the fair market value of the property Reese Corp. received;

- • the lack of any expert valuation testimony by anyone having expertise in hospital operations; and

29

> • this court's lack of expertise in hospital operations and in making
> appropriate assumptions (regarding such matters as discount
> rates) in performing a discounted cash flow analysis.

Recons. Mem. Dec. 37–40 (emphasis added).

To the extent Judge Teel did anything "creative" in his income valuation analysis, or departed from the testimony of the experts, it was because the experts and witnesses failed to give Judge Teel the tools he needed to derive an income valuation. This Court finds that Judge Teel would have been fully justified, on page 134 of his Amended Memorandum Decision, to rule against Alberts because a critical failure of proof. This provides an independent grounds for affirming the judgment of the bankruptcy court.

### 2. *Upon Reconsideration, the Bankruptcy Court Calculated the Value of the Possibility of Renegotiating Reimbursement Rates, the Value of Which Would Offset any "Double Counting" Error*

In its Amended Memorandum Decision, the bankruptcy court made several assumptions in Alberts's favor. Even after assuming these matters in the favor of Alberts, the bankruptcy court still found that the value of Reese Hospital exceeded what Reese Corp. paid. Thus the court below did not find it necessary to make certain factual determinations. For example, Judge Teel assumed for the sake of argument that the value of renegotiating HMO reimbursement rates from Humana would be zero:

> Although a hypothetical purchaser would likely have assumed that there was some chance of renegotiating the Humana terms, the court assumes in Alberts's favor that the purchaser would have not utilized an increased reimbursement rate for outpatient services performed on Humana patients in its projections of revenues because Humana would have the upper-hand in any negotiations with Reese Hospital due to its relationship with Mercy Hospital.

Am. Mem. Dec. 111. In a crucial passage, the bankruptcy court stated:

> This assumption results in understating the value of Reese Hospital because a hypothetical purchaser would likely assign some value to the chance of renegotiation the Humana terms, but, even so, the value the court ultimately

> determines for what Reese Corp. received exceeds the Reese Transfers.
> Accordingly, for ease of analysis, the court assigns zero value to the prospect of
> renegotiating the Humana terms, without actually deciding what value that
> prospect would have.

*Id*. at 111–12.   The bankruptcy court acknowledged that its assumption could significantly

undervalue Reese Hospital, and that the bankruptcy court took no position as to the actual value

of the prospect of renegotiation.   In the Amended Memorandum Decision, Judge Teel cited

credible testimony that suggests a reasonable purchaser would place some value on the

possibility of renegotiating the contract.  *Id*. at 112 n.74.

In its Memorandum Decision Denying Reconsideration, the bankruptcy court took the

opportunity to fix a value to the prospect of renegotiating with Humana.   While Reese Hospital's

managed care arrangement with Humana represented a "significant component of Reese

Hospital's business," Recons. Mem. Dec. 21, Humana was reimbursing Reese Hospital at rates

often below the cost of providing services, Am. Mem. Dec. 69–70.   Two witnesses, former

DCHC Vice Presidents Erich Mounce and Donna Tablot, testified that the Reese Management

Team was optimistic that they could renegotiate the Humana contract to provide more favorable

terms.  *See* Am. Mem. Dec. 112 n.74.   The possibility that a purchaser could obtain higher rates

from Humana could have significant value to a prospective buyer.

In fully analyzing the issue on reconsideration, Judge Teel first corrected an error he had

made in his Amended Memorandum Decision:

> In addressing whether value should be ascribed to the possibility of favorable
> renegotiation of Humana reimbursement terms, the court relied on [former DCHC
> Vice President Mel] Redman's testimony, which was based on negotiations with
> Humana *after* the Transfer Date.   Such reliance was error.   In the hindsight of
> post-closing negotiations, it is evident that Humana had the upper hand in any
> negotiations due to its close relationship with Mercy Hospital, but hindsight is not
> a permissible way of performing a fraudulent conveyance calculation.   DCHC and
> Reese Corp. representatives contacted Humana to begin negotiating increased
> rates before the Transfer Date.   There is no suggestion in the record that those

31

early negotiations ought to have caused Reese Corp. to realize that continuation of negotiations after Reese Corp. purchased Reese Hospital had little chance of being successful.

Recons. Mem. Dec. 22–24 (citations omitted) (emphasis in original).

Judge Teel then found as credible the testimony of former DCHC Vice Presidents Mounce and Talbot who "believed that Reese Hospital would be able to negotiate a 15% increase in Humana rates." *Id.* at 24. As Judge Teel characterized and credited the testimony of Mounce, "[t]he belief that Humana rates could be successfully renegotiated, a belief formed before the closing of the sale, was not lightly held." *Id.* Talbot testified that she thought that Reese Corp. would be able successfully to renegotiate the Humana contract within the first six months of 1999, and Reese Corp. was "very surprised" when it was unable to do so. Trial Tr. 1075:14–1076:6, Jan. 25, 2007 (Talbot, D.).

Based on this testimony, the bankruptcy court concluded:

Talbot and Mounce viewed Reese Corp. as having a better than even chance of achieving the 15% increase in Humana reimbursement rates. No evidence was presented that rebuts the reasonableness of that belief. Alberts has not convinced me that a hypothetical purchaser would have discovered before purchasing Reese Hospital that Humana's close relationship with Mercy Hospital would doom any effort at obtaining better reimbursement rates from Humana. Because Alberts bore the burden of proof at trial, I find that a hypothetical purchaser would have ascribed a 50% probability to the prospect of achieving a 15% increase in Humana reimbursement rates.

Recons. Mem. Dec. 25–26. The court then valued that 50% chance of achieving a 15% increase in reimbursement rates at $21,684,434.95. *Id.* at 26.

The trial court was within its rights to make additional findings of fact in response to appellant's motion for reconsideration, FED. R. CIV. P. 59 (incorporated by FED. R. BANKR. P. 9023), and this Court should give these new findings deference as if they were in the original Amended Memorandum Decision, *see Nat'l Metal Finishing Co. v.*

*BarclaysAmerican/Commercial, Inc.*, 899 F.2d 119, 126 (1st Cir. 1990); 9 MOORE'S FED. PRAC.—CIVIL § 52.60 (3d ed. 2012).  Furthermore, this Court may affirm the judgment of the bankruptcy court "on any ground which the law and the record permit that would not expand the relief" granted below.  *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 166 n.8 (1977).  The bankruptcy court's conclusion that the possibility of renegotiating the Humana contract was worth approximately $21.6 million is reasonable and well supported by the record, and therefore affirmed on appeal.  This Court finds that this provides another independent ground for affirming the judgment of the bankruptcy court—even if the bankruptcy court "double counted" or committed some other reversible error regarding the $20.6 million capital transfer, this would not require reversal of the bankruptcy court.  For the sake of simplicity, the original Amended Memorandum Decision assumed certain facts in Alberts's favor that led to a undervaluation of Reese Hospital.  When the bankruptcy court took a closer look, and challenged some of those favorable assumptions, it found it undervalued Reese Hospital under the income approach by at least $21 million.

In his Reply Brief, Alberts makes a few arguments against considering the value of the possibility of renegotiating the Humana contract.  These arguments do not hold weight.  First, Alberts argues:

> The bankruptcy court's analysis of the Humana contract in its opinion on the Trustee's motion to reconsider was part of a broader analysis of the Trustee's argument that the Bankruptcy Court had underestimated the professional fees to be paid by the Hospital in the course of treating patients.  The Bankruptcy Court stated that, even if it assumed that the Trustee's argument on professional fees were correct and that the estimated value of the Hospital's income had been overstated by over $13 million due to an error concerning those fees, that difference would be offset by potential savings from a potentially renegotiated Humana contract.
>
> In arguing that the Hospital's value should be increased by $21.6 million, HCA chooses to ignore the Bankruptcy Court's predicate assumption that the Hospital also would pay out at least $13.3 million in additional professional fees.

Appellant's Reply 16. This severely misstates what the bankruptcy court did in its reconsideration opinion. In no way were the factual findings regarding the value of possibly renegotiating the Humana contract "predicated" on paying out an additional $13.3 million in professional fees. It is not as if Reese Hospital would have to pay these additional fees as a prerequisite to renegotiating the Humana contract. Logically, that would not be the case as the issue was increasing the *rates* at which Humana reimbursed Reese Hospital—under renegotiated higher rates, Humana would pay Reese more for substantially the same work. The only logical connection between the two is that Judge Teel argues that one would more than offset the other.

Alberts quotes the following language from the bankruptcy court's reconsideration opinion as his smoking gun:

> In summary, the court determines that (1) taking into account the value that would be ascribed by a reasonable hypothetical purchaser to the prospect of renegotiating the Humana contract and (2) accepting Alberts's position regarding what a reasonable hypothetical purchaser would determine variable professional fees, a hypothetical purchaser would ascribe a value to Reese Hospital greater than the amount previously determined by the court.

Recons. Mem. Dec. 27 (*quoted in* Appellant's Reply 16). Because of this, and the fact that professional fees and the Humana contract were "addressed in tandem in a stand-alone section of the Bankruptcy Court's opinion," Appellant's Reply 16–17, Alberts argues that "the cost of professional fees and the income from the Humana contract[] were linked," *id*. at 17. This argument is unpersuasive. This Court will reiterate: *Nothing* in the bankruptcy court's opinion makes its factual findings regarding the value of possibly renegotiating the Humana contract contingent on paying out higher professional fees. Alberts fails to distinguish between facts the bankruptcy court assumes for the sake of argument, and facts the bankruptcy court finds from the evidence. The bankruptcy court *assumed* for the sake of argument that Alberts was right about

higher professional fees, but *found* as a matter of fact that the value of possibly renegotiating the Humana contract was $21.6 million.   Judge Teel's factual determinations about the Humana contract go directly to the value of the Hospital under the income approach; his discussion of the Humana contract could just as easily went after his discussion of Alberts's double counting argument.   This Court will not allow structure to trump logic, especially when the logic is this persuasive.

Alberts makes a second, also unavailing argument against Judge Teel's findings regarding the Humana contract.   Alberts argues that "based on the record before it, the Bankruptcy Court could not have found that the prospect of renegotiating the Humana contract was worth $21.6 million in isolation."   Appellant's Reply 18.   At it essence, this argument is of the "unless the bankruptcy court mechanically chooses between competing experts, it has committed reversible error" variety.   The fact that the experts did not assign any particular value to the Humana contract negotiations did not prevent Judge Teel from coming to a reasoned decision based on the evidence.   At trial, Judge Teel asked specifically about the chances of obtaining a 15% increase in reimbursement rates.   One DCHC VP, Mr. Mounce, testified that he was "85, 90 percent confident" that Reese Corp. could obtain at least a 15% increase.   *See* Recons. Mem. Dec. 24.   Crediting this testimony, and the testimony of Ms. Talbot, Judge Teel made a reasoned and supported (and one could say, conservative) finding that a "hypothetical purchaser would have ascribed a 50% probability to the prospect of achieving a 15% increase in Humana reimbursement rates."   *Id*. at 25–26.   From there, all Judge Teel had to do was use the projected revenues from the Humana contract (previously-made factual determinations not challenged on appeal) to derive a value for the potential of renegotiation.   *Id*. at 26.   These are

reasonable inferences, based on factual findings supported in the evidence. Judge Teel did not need any particular expert or witness to ascribe a specific value to the contract negotiations.

This Court could affirm the judgment of the bankruptcy court, regardless of whether it committed the errors alleged by appellant, because the value affixed to the possibility of renegotiating the Humana contract would more than make up any overvaluation caused by the bankruptcy court's alleged errors.

## IV.   CONCLUSION

Judge Teel did not commit reversible error when he calculated the value of Reese Hospital under the income method, and thus determined that appellant received reasonably equivalent value. Alberts is wrong to suggest that Judge Teel "double counted" a $20.6 million capital transfer when determining the value of Reese Hospital in a discounted cash flow analysis; there was no such "double counting," and Judge Teel's treatment of the $20.6 million did not artificially inflate the value of the Hospital. Alberts is also wrong to suggest that Judge Teel committed reversible error when he found, contrary to two expert witnesses, that the record did not support incorporating the $20.6 million into a discounted cash flow analysis, and instead treated the amount as a non-operating surplus asset. Judge Teel acted well within his role as fact finder when he credited, in part, the expert testimony and decided the case on what he thought comported with the evidence and facts.

Even if Judge Teel erred, his error was harmless. This Court finds two, independent grounds for affirming the decision of the bankruptcy court. First, Judge Teel would have been well within his rights to rule against Alberts because Alberts failed to prove what a reasonable purchaser would have valued Reese Hospital under the income approach, and thus failed to prove that Reese Corp. and DCHC did not receive reasonably equivalent value. Judge Teel

found that all of the income projections Alberts offered suffered from significant infirmities. Instead of simply ruling against Alberts then, Judge Teel took the more difficult route of trying his best to partially credit Alberts's projections and modify them consistent with the record. During this exercise, the bankruptcy court committed the alleged errors in reasoning.  However, since Judge Teel would have been completely justified in ruling against Alberts before endeavoring to salvage Alberts's projections, any error in computing the Hospital's value under the income approach would be harmless.  Second, in his original decision, Judge Teel made several assumptions in Alberts's favor.  Upon reconsideration, Judge Teel found that the possibility that a potential buyer could renegotiate with Humana to receive better rates was worth over $21 million.  This factual finding was reasonable, supported by the evidence, and relied on a correct application of the controlling law.  Since Judge Teel undervalued Reese Hospital under the income approach by over $21 million, any "double counting" or *Daubert* error in considering the $20.6 million capital transfer would thus be offset and harmless.  For these reasons, this Court will affirm the final judgment of the U.S. Bankruptcy Court for the District of Columbia in Adversary Action 04-10366.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on July 11, 2013.